(No. 43592.—

THE CITY OF ALTON, Appellee, *vs.* UNION ELECTRIC COM-
PANY *et al.,* Appellants.

*Opinion filed May 21, 1971.*

WILLIAM J. SCOTT, Attorney General, and PETER A.
FASSEAS, Special Assistant Attorney General, both of Chi-
cago, for appellant Illinois Commerce Commission.

ROBERT BRODERICK and POPE AND DRIEMEYER, both of
East St. Louis, for appellant Union Electric Company.

THAD R. CARTER, Corporation Counsel, of Alton, for
appellee.

Mr. JUSTICE SCHAEFER delivered the opinion of the
court:

On March 10, 1968, Union Electric Company (Com-
pany) eliminated the position of the on-duty "troubleman"
who rendered emergency service to the City of Alton be-
tween 11:00 P.M. and 7:00 A.M., designated as the "owl
shift." The City filed a complaint with the Commerce Com-
mission on April 16, 1968, alleging that as a direct and
proximate result of the elimination of that position "emer-
gency service calls will not and cannot be promptly answered
and taken care of, thereby directly affecting the safety and

welfare of the citizens of the City of Alton * * *." After a hearing before an examiner, the full Commission dismissed the City's complaint. On review, the circuit court of Madison County set aside the order of the Commission. The Company, joined by the Commission, has appealed directly to this court. 43 Ill.2d R. 302.

From April of 1950 until March 10, 1968, the Company employed a single troubleman during the owl shift, who was on duty at the Company's Oakwood work headquarters in Alton. On March 10, the Company instituted a new procedure for handling calls for service during the owl shift. Instead of having one troubleman on duty at the work headquarters, the Company has four troublemen subject to call at their homes. After he is contacted, the troubleman proceeds to the work headquarters to pick up a service truck and his tools. Under the new procedure, the Company also "holds over" at its work headquarters the troubleman working the 3:00 P.M. to 11:00 P.M. shift whenever the weather bureau issues a severe weather warning.

At the hearing before the examiner, the Company proved that during the entire year of 1967, it received a total of 75 trouble calls, other than street light replacements, during the owl shift, or approximately one call every five days. Under the new procedure, the cost to the Company between March 10 and June 12, 1968, was $918.42, a saving during that period of $3,928.85, or $15,000 on an annual basis.

The Company has also eliminated the job of the on-duty troublemen from other districts serviced by the Company with no complaints either from its customers residing in those other districts or the local governing or regulatory authorities. Those districts have from 5328 to 34,219 customers, while the Alton district, which includes Alton, Hartford, South Roxana and portions of Chouteau, Godfrey, Wood River and Foster Townships, consists of 22,033 customers.

The City's principal objection to the new procedure is

that there is a substantial increase in the time it takes a troubleman to service calls. Under the old procedure, the Company was generally able to contact its troubleman at the work headquarters within three minutes after its dispatcher in St. Louis received a call for service, while under the new procedure as much as seven minutes is required. In addition, once the troubleman was contacted at headquarters it formerly took him on the average only 15 minutes to respond to the call. Under the new procedure, the troubleman must first travel to work headquarters to pick up a service truck and his tools. As a result, the average response time for the eight calls serviced between March 10 and June 12 by calling troublemen at their homes was 42 minutes, with one call taking 78 minutes to service. The latter occasion, however, took place during a storm period when primary wires were down. The City also argues that no real savings have accrued under the new procedure because the number of troublemen on the Company's payroll has not decreased. There was testimony, however, that the troubleman who worked the owl shift does additional work that otherwise somebody else would have had to do.

The Commission found that the eight calls serviced by the Company under the new procedure "is too small to establish" a stable statistical average, and that under the new procedure, "because Union's dispatcher calls the trouble man at his home, answering time, in some cases, could be less than under the previous procedure." The City does not dispute these findings, nor does it dispute the further finding of the Commission that under the old procedure the expired time could exceed the average three minute dispatching time and 15 minute response time. Indeed, as the Commission found, the longer delays were apt to occur when the need for emergency service was the greatest, as in the event of a severe storm when several calls reporting downed primaries were received at approximately the same time. In such a case, because only one employee was available at the

work headquarters, only one wire could be cleared or repaired at one time.

On the basis of the evidence, the Commission found that "neither procedure of processing emergency calls by Union before or after the termination of the Owl Shift guarantees complete public safety during the Owl Shift period; comparisons [*sic*] of one procedure with the other does not show a decided advantage of one procedure over the other; the increase in trouble men response time from fifteen to forty-two minutes has not had a significant or measureable adverse effect on public safety and public convenience; the extra expense of maintaining a full time troubleman during the Owl Shift is not warranted under these circumstances; * * *."

Section 68 of the Illinois Commerce Commission Act provides: "the findings and conclusions of the Commission on questions of fact shall be held prima facie to be true and as found by the Commission; and a rule, regulation, order or decision of the Commission shall not be set aside unless it clearly appears that the finding of the Commission was against the manifest weight of the evidence presented to or before the Commission * * *." (Ill. Rev. Stat. 1967, ch. 111⅔, par. 72.) The present issue concerns a matter of minute detail in the operation of the Company. In our opinion the findings of the Commission were not against the manifest weight of the evidence.

The judgment of the circuit court of Madison County is reversed, and the order of the Illinois Commerce Commission is confirmed.

*Judgment reversed; order confirmed.*